UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

—————

CRAIG JAMES MARR,

                Petitioner,                Case No. 1:07-cv-629

v.                                   Honorable Paul L. Maloney

CARMEN PALMER,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner was convicted in the Ingham County Circuit Court of second-degree murder, MICH. COMP. LAWS § 769.317, and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b(1), for which he was sentenced on January 12, 2001, to prison terms of 220 to 360 months for the murder conviction and two years for the felony-firearm conviction. In his *pro se* petition, Petitioner raises eight grounds for relief, as follows:

I.      MR. MARR'S RIGHT TO PRESENT A DEFENSE WAS IMPROPERLY CURTAILED BY THE TRIAL COURT'S RULINGS EXCLUDING CRITICAL TESTIMONY RELEVANT TO CLAIMS OF SELF-DEFENSE.

II.     THE TRIAL COURT DENIED MR. MARR A FAIR TRIAL BY REFUSING TO INSTRUCT THE JURY ON THE LESSER OFFENSES OF MANSLAUGHTER AND RECKLESS DISCHARGE OF A FIREARM RESULTING IN DEATH.

III.    THE COURT ERRED BY FINDING DUE DILIGENCE OF POLICE TO PRODUCE PROSECUTION WITNESS SAVITRA McCLURKIN FOR TRIAL, THUS ALLOWING THE PROSECUTOR TO READ IN HER PRIOR TESTIMONY.

IV.     THE PROSECUTOR PREJUDICED MR. MARR WITH IMPROPER ARGUMENT ATTACKING A WITNESS.

V.      THE PROSECUTOR DENIED MR. MARR DUE PROCESS AND THE RIGHT OF CONFRONTATION BY ASSERTING "FACTS" NOT SUPPORTED BY THE EVIDENCE.

VI.     THE COURT IMPROPERLY EXCLUDED RELEVANT DEFENSE TESTIMONY WHILE ADMITTING SIMILAR EVIDENCE ON BEHALF OF THE PROSECUTION.

VII.    MR. MARR WAS PREJUDICED BY LEADING QUESTIONS REGARDING [THE] CHARACTER OF PEOPLE INVOLVED IN THE INCIDENT.

VIII.   MR. MARR WAS PREJUDICED BY INEFFECTIVE ASSISTANCE OF COUNSEL.

Respondent has filed an answer to the petition (docket #8) stating that the grounds should be denied.

Petitioner filed a response (docket #9). Upon review and applying the AEDPA standards, I find that

Petitioner's claims are procedurally defaulted or are without merit. Accordingly, I recommend that

the petition be denied.

## Procedural History

### A.      Trial Court Proceedings

The state prosecution arose from the shooting death of Nicholas Brown on May 22,

2000, in Lansing, Michigan. Petitioner, who was eighteen-years-old at the time of the offense, was

charged with first-degree murder and felony-firearm. He was tried before a jury beginning on

January 4, 2001 and concluding on January 16, 2001.[1]

---

[1] The trial transcripts will be referred to as follows:

Tr. I     - Trial Transcript Volume I, January 4, 2001 (docket #16)
Tr. II    - Trial Transcript Volume II, January 5, 2001 (docket #17)
Tr. III   - Trial Transcript Volume III, January 8, 2001 (docket #18)

Lauren Solomon, who was eighteen-years-old at the time of trial, testified that she went to 401 North Pennsylvania to visit friends on the night of May 22, 2000. (Tr. I, 169-70.) Brandon White lived in the upstairs apartment and Nicholas Brown, aka Kool-Aid, was a frequent visitor. (Tr. I, 170-73.) When Solomon arrived that night, White, Ali Hines, Petitioner and Brown were at the apartment. (Tr. I, 174, 179.) Savitra McClurkin, aka Pancake, and Petitioner's brother, Roosevelt Corwin, arrived shortly after Solomon. (Tr. I, 176-77, 195.) Solomon testified that no one was drinking or smoking marijuana. (Tr. I, 178.) At one point, Petitioner, Corwin and McClurkin went down to the porch together and some sort of altercation occurred. (Tr. I, 178-180.) McClurkin came back up to the apartment briefly and then went back down the stairs. (Tr. I, 179-80.) Solomon and the other people in the apartment went down and broke up the fight between McClurkin and Petitioner. (Tr. I, 180.) Everyone except Petitioner immediately came back up to the apartment. (Tr. I, 181.) When Petitioner came up to the apartment sometime later, White asked him to leave. (Tr. I, 181-82.) Petitioner and White got into an argument. (Tr. I, 182.) Brown joined the argument and asked Petitioner why he felt the need to argue with everyone. (Tr. I, 183.) The argument escalated to the point that Brown and Petitioner decided to go outside to fight. (Tr. I, 183-85.)

Solomon testified that Petitioner went out the door first and kept turning back to say things that egged on the argument. (Tr. I, 184-86.) The man from the downstairs apartment (David Lesoski) was in front of Petitioner. (Tr. I, 186.) Solomon and McClurkin followed them outside.

Tr. IV  - Trial Transcript Volume IV, January 9, 2001 (docket #19)
Tr. V   - Trial Transcript Volume V, January 11, 2001 (docket #20)
Tr. VI  - Trial Transcript Volume VI, January 12, 2001 (docket #21)
Tr. VII - Trial Transcript Volume VII, January 16, 2001 (docket #22)

(Tr. I, 186.) Solomon saw Petitioner grab a gun from David. (Tr. I, 187.) Solomon heard a shot and saw Brown fall off the front porch where he had been standing. (Tr. I, 187-88.) Brown tried to move, but could not get up from the ground. (Tr. I, 203-04.) A few seconds after the first shot, Petitioner aimed the gun, kneeled down and shot Brown a second time while he was laying on the ground. (Tr. I, 189-92, 198-99.) Petitioner fled after he fired the second shot. (Tr. I, 190.) Solomon never saw Brown with a weapon. (Tr. I, 188.) Solomon did not hear any exchange of words between Brown and Petitioner before the gunshot. (Tr. I, 187-88, 199-200.) Petitioner was wearing an orange pull-over and jeans that night. (Tr. I, 197.) Solomon testified that Brown was a close friend, but she did not know Petitioner very well. (Tr. I, 205.)

Lloyd Ali Hines testified that he was staying at Brandon White's apartment at 401 North Pennsylvania on May 22, 2000. (Tr. II, 215.) Hines testified that Petitioner was at the apartment sometime during the afternoon and had what looked like a nine millimeter gun with him. (Tr. II, 222-23.) Hines went out and came back around 8:30 p.m. (Tr. II, 224.) At that time, Petitioner, Brown, White, McClurkin, Solomon and Corwin were at the apartment. (Tr. II, 225.) The guy from the apartment downstairs (David Lesoski) also was there some of the time. (*Id*.) Sometime that evening, Hines saw Petitioner hand the gun to Corwin. (Tr. II, 225-26.) According to Hines, McClurkin and some other people, including Petitioner, went outside for a while. (Tr. II, 228-29.) McClurkin came back up to the apartment by herself and was upset and crying. (Tr. II, 230.) Hines saw McClurkin grab a knife and run back downstairs. (Tr. II 231, 246.) Hines, Brown and White went after McClurkin to see what was wrong. Hines saw Petitioner holding McClurkin down on the stairs. (Tr. II, 232.) Brown and White pulled Petitioner off of McClurkin and everyone went back upstairs except Petitioner, who came back about twenty minutes later. (Tr. II, 232-34.)

Hines testified that Brown was upset that Petitioner was back in the apartment after what had happened with McClurkin. (Tr. II, 234-25.) Petitioner got angry and told Brown that it was between him and McClurkin. (Tr. II, 235.) Hines testified that Petitioner and Brown continued to argue and Brown said something to the effect of "picking on a girl, why don't you pick on me," which Petitioner took as a challenge to fight. (Tr. II, 237-38, 245.) Brown and Petitioner left the apartment and everyone else followed them, except Hines and White. (Tr. II, 241.) Hines thought that Corwin still had the gun because he saw Petitioner hand it to him earlier in the evening. (Tr. II, 241, 246.) After they went outside, Hines could hear Brown say something about a gun. (Tr. II, 241-42, 249.) After that, he heard two shots about five second apart. (Tr. II, 242.) Hines did not see anyone drinking that night, but he had gone to the store a couple of times earlier that day to buy beer. (Tr. II, 243, 250.) Petitioner went with him on one of the trips to the store. (Tr. II, 250.) Hines never saw Brown in possession of a weapon that night. (Tr. II, 240.)

Miranda Lesoski testified that on May 22, 2000, she lived with her husband and two children in a first-floor apartment at 401 North Pennsylvania. (Tr. II, 252-55.) Miranda described that in order to enter the building from the front, you have to walk up three stairs to a large porch area. (Tr. II, 256-57.) Miranda testified that she first saw Petitioner at 5:00 or 6:00 p.m. on May 22. (Tr. II, 273.) She did not know Petitioner very well, but he came over every couple of days to visit with her husband. (Tr. II, 260.) Sometime that evening, Miranda heard Petitioner arguing with a girl on the front porch. (Tr. II, 270.) Petitioner came into their apartment and asked for a band-aid because the girl cut him on the hand. (Tr. II, 270-71.) Miranda testified that Petitioner was not staggering and did not have slurred speech. (Tr. II, 271-72, 274-76.) Later that evening, Miranda heard two shots at close range. (Tr. II, 263-64.) Just before the shots were fired, Petitioner and

Miranda's husband were standing near the front entrance to the apartment. (Tr, II, 264.) Miranda heard her husband tell Petitioner to come in the house and forget about it. (Tr. II, 266-67.) She also heard Brown say, "White boy, if you point that gun at me, I'll kill you and your brother." (Tr. II, 272-73.) After the shots, Miranda could see two people, one black and one white, running away toward Shiawassee. (Tr. II, 267-68.) After the shooting, Miranda's husband called 911. (Tr II, 258.) Miranda testified that they received two phone calls later that night. Her husband answered the first call. Miranda answered the second call, but she hung up when she recognized Petitioner's voice. (Tr. II, 261-63.)

David Lesoski, Miranda's husband, testified that he met Petitioner after he moved to the apartment at 401 North Pennsylvania. (Tr. II, 279-80, 306.) David had only known Petitioner for two or three weeks before the shooting. (Tr. II, 280.) On May 22, David first saw Petitioner around 5:30 or 6:00 p.m. (Tr. II, 281.) Petitioner was wearing an orange shirt, pants and white K-Swiss tennis shoes. (Tr. II, 282.) Petitioner was on the front porch drinking a beer with White and two girls. (Tr. II, 283-84, 315-16.) Petitioner's beer was larger than a normal twelve ounce bottle. (Tr. II, 302.) David also saw Petitioner and White drinking from a bottle of Hennessy cognac. (*Id*.) Later that evening, David testified that there was a party going on in White's apartment with a lot of people and loud music. (Tr. II, 314.) According to David, there were frequent parties upstairs and he had people knocking at his door at all hours of the night looking for White. (Tr II, 315.) At some point during the evening, David heard Petitioner arguing with a girl on the front porch. (Tr. II, 296.) Petitioner came into their apartment and David gave him a band-aid for a cut on his finger. (Tr. II, 297-98.)

Just before 11:00 p.m., David saw Petitioner standing in his doorway holding a black gun. David identified People's Exhibit #7 as the gun that Petitioner had in his hand. (Tr. II, 290-91.) David denied handing the gun to Petitioner. (Tr. II, 301.) David told Petitioner that if he was going out there to fight, he should put the gun away and fight like a man. (Tr. II, 292-93.) Petitioner went outside. A few minutes later, David heard two shots. (Tr. II, 293-94.) Just before the shots, David heard Brown say "you best put it away or put it down, because I'll take it from you and shoot you and your brother." (Tr. II, 313.) David called 911 to report the shooting. (Tr. II, 285.) After David made the 911 call, they received two phone calls. David answered the first call, which came fifteen or twenty minutes after the shooting. (Tr. II, 285, 288.) The caller said that it was "his buddy Jake," but David realized that it was Petitioner when he kept talking and asked if anyone was "running their mouth." (Tr. II, 285-87.) David testified that Petitioner's voice sounded muffled, like he had something over the phone receiver, but his speech did not sound slurred like he had too much to drink. (Tr. II, 288.) David testified that he saw Petitioner drinking a beer, but he never appeared drunk that night. (Tr. II, 299-300.) David denied that he and Petitioner had drank or smoked marijuana together. (Tr. II, 303.) David never saw Brown with a weapon that night. (Tr. II, 322.)

Roosevelt Corwin, who was nineteen-years-old at the time of trial, testified that Petitioner's mother, Jackie Marr, was his foster mother. (Tr. II, 326-28.) Corwin had lived with Petitioner and Jackie Marr on Rutherford Street in East Lansing for about three years before the shooting. (Tr. II, 326.) Corwin considered Petitioner to be his brother. (*Id*) Corwin was removed from Jackie Marr's home after the shooting. (Tr. III, 327.) Corwin testified that Petitioner carried a loaded black handgun, which Corwin identified as People's Exhibit #7. (Tr. II, 330-31.) Corwin went to White's apartment at 401 North Pennsylvania on a regular basis. (Tr. II, 331-32.) On May

22, 2000, Corwin first went to White's apartment at 1:00 or 2:00 p.m. (Tr. II, 334.) At that time, White and McClurkin were there. (Tr. II, 333-34.) Corwin and McClurkin left the apartment for several hours and returned at 8:00 or 9:00 p.m. (Tr. II, 334-36.) Solomon, White, Hines, Brown and Petitioner were at the apartment when they arrived. (Tr. II, 337.) Shortly after Corwin returned, Petitioner gave Corwin his gun and asked him to hide it. (Tr. II, 347-48.) Corwin put the gun under the couch or under the couch cushions. (*Id*.) Corwin testified that people smoked weed at White's apartment all the time, but he could not remember if he smelled it that night. (Tr. II, 375-77.) Later that evening, Corwin, Petitioner and McClurkin went down to the front porch to smoke marijuana. (Tr. II, 380-382.) They smoked a blunt, which is a cigar filled with marijuana. (Tr. II, 381-85.) Petitioner also had been drinking a bottle of Hennessy cognac and chased it with a bottle of Heineken beer. (Tr. II, 343, 385-89.) While they were out on the porch, Petitioner and McClurkin got into an argument because Petitioner made insulting sexual remarks to her. (Tr. II, 338-40.) McClurkin got very upset and got into a physical altercation with Petitioner. (Tr. II, 339-41.) Corwin did not want to get involved in the fight, so he left and walked around the block to his friend, Cheeko's house. (Tr. II, 342.)

Corwin came back to White's apartment about fifteen minutes later. (Tr. II, 343.) McClurkin had a busted lip and someone said that Petitioner had gotten cut. (Tr. II, 344.) Corwin ran out the door to look for Petitioner and met him on the stairs. (Tr. II, 345.) Petitioner was not having any trouble walking. (*Id*) Corwin asked him if he was okay, but Petitioner just pushed past him up the stairs. (Tr. II, 345-46.) When they were back in the apartment, Petitioner asked for his gun back. (Tr. II, 347-49.) Corwin agreed that Petitioner got nasty when people crossed him. (Tr. II, 349-50.) Petitioner seemed calm and suggested to Corwin that they leave, but Corwin wanted to

stay.  (Tr. II, 351-52, 390.)  Shortly thereafter, Brown walked up to Petitioner and said something like "pick on a girl, why don't you pick on me." (Tr. II, 391-92.)  Petitioner instigated the fight with Brown by saying, "let's go outside and take care of this like men."  (Tr. II, 353.)  Petitioner went down the stairs first.  (Tr. II, 355.)  Corwin told Brown that Petitioner could not handle his alcohol and begged him not to fight, but Brown smiled at Corwin and went down behind Petitioner.  (Tr. II, 355-56; 392-93.)

Corwin went out to the porch behind Petitioner and Brown.  (Tr. II, 393-94.)  The rest of the group stayed inside the doorway of the apartment.  (Tr. II, 393.)  Brown was standing on the sidewalk with his shirt off and Petitioner was standing in front of the Lesoski's door.  (Tr. II, 361-62.)  Brown said something to Petitioner like, "let me show you how real n-----s do this shit."  (Tr. II, 395-96.)  At that point, Petitioner went inside the Lesoski's apartment.  (Tr. II, 396.)  After Petitioner went into the apartment, Brown jumped up on the front porch and said, "you scared ass–n-----, I don't give a f--- about you or Corwin – or your brother – I'll kill both of you."  (Tr. II, 398.)  Petitioner fired the first shot immediately after that statement.  (Tr. II, 364-66, 399.)  After Brown was hit, he rolled himself off the front porch onto the ground.  (Tr. II, 399.)  Petitioner then approached Brown and shot him a second time while he was laying on the ground moaning.  (Tr. II, 364-66, 407-08.)  Corwin testified that the two shots were fired within a minute of each other.  (Tr. II, 365-66.)  After the second shot was fired, Petitioner looked at Corwin and said, "I kill that 'n-----.'"  (Tr. II, 368.)  Brown did not have a weapon when Petitioner shot him.  (Tr. II, 364.)  Petitioner and Corwin fled to a nearby construction site where Petitioner buried the gun in a dirt mound in front of a fence.  (Tr. II, 367.)  Corwin could smell alcohol on Petitioner's breath that night and believed he was drunk based upon his unusually aggressive behavior.  (Tr. II, 378-80.)

However, Corwin did not believe that Petitioner was too drunk to know what he was doing.  (Tr. II, 409.)

Corwin testified that he was very upset about what Petitioner had done and gave a statement to police later that night.  (Tr. II, 368-69.)  Petitioner called Corwin before trial and asked him to testify that Brown was reaching for a gun, which was not true.  (Tr. II, 370.)  Jackie Marr also asked Corwin to testify at the preliminary examination that Brown had a gun.  (*Id*)  According to Corwin, he no longer lived with Jackie Marr because he did not comply with her request.  (Tr. II, 371.)  Corwin admitted that he testified at the preliminary examination in the light most favorable to Petitioner and tried to leave out important details.  (Tr. II, 402-03.)  For example, Corwin lied when he told the prosecutor at the preliminary examination that he did not see the second shot.  (Tr. II, 403.)  Corwin testified that he was telling the truth at trial.  (*Id*)

Brandon White, who lived in the upstairs apartment at 401 North Pennsylvania, also testified regarding the events leading up to the shooting on May 22, 2000.  (Tr. II, 435.)  White saw Petitioner with a black handgun, which he identified as People's Exhibit #7.  (Tr. II, 437-39.)  Sometime that evening, Petitioner, Corwin and McClurkin went down to the porch to smoke some marijuana.  (Tr. II, 440.)  McClurkin came back up the apartment looking upset; she grabbed a knife from the kitchen and headed back out the door.  (Tr. II, 441.)  When White followed her, he saw Petitioner and McClurkin struggling on the stairs.  (Tr. II, 442.)  McClurkin had the knife and Petitioner was holding a gun to her side.  (Tr. II, 442-43.)  Petitioner was trying to pull the trigger, but the gun did not go off.  (Tr. II, 464-65.)  After people from the apartment separated them,  they all went back up to the apartment, except Petitioner, who came up later and wanted to talk to McClurkin.  (Tr. II, 444.)  White asked Petitioner to leave, which caused Petitioner to become hostile

towards White. (Tr. II, 445.) At that point, Brown spoke up and asked Petitioner, "[W]hat's your purpose. What you looking for?" (Tr. II, 446.) Petitioner and Brown continued to argue and it escalated to the point that they were going outside to fight. (Tr. II, 447-48.) During the argument, Petitioner told Corwin to "give me my shit." (Tr. II, 448-51.) White saw Corwin pick up the gun and believed that he handed it to Petitioner, but his view was blocked so he could not be certain that Petitioner took the gun at that point. (Tr. II, 450-51.)

White testified that Petitioner went out of the apartment first, followed by Brown, Corwin and the others. (Tr. II, 452.) White told Brown not to go outside because Petitioner had a gun. (*Id.*) When White got to the bottom of the stairs, he heard Brown say something like, "[I]f you point that gun at me . . . I'll kill you and your brother." (Tr. II, 456.) White did not hear Petitioner say anything. (Tr. II, 473.) Brown had removed his shirt and jewelry and was standing on the porch with his fist balled up. (Tr. II, 456-57.) White never saw Brown with a weapon that evening. (Tr. II, 457.) White saw Petitioner with the gun in his hand. (Tr. II, 458.) He did not want to be involved in what was going on, so he closed the front door and went back up to his apartment. (Tr. II, 458-60.) White heard two gunshots that were approximately ten to twenty seconds apart. (Tr. II, 460.) White testified that he saw Petitioner drinking a Heineken beer that night, but he did not notice Petitioner having any problems walking or speaking. (Tr. II, 461-62, 468.)

Jerry Buckner testified that he lived at 212 North 8th Street in Lansing. (Tr. II, 412.) On the night of May 22, 2000, Buckner was on his front porch drinking a beer with Eric Brown when Petitioner ran up on his front porch. (Tr. II, 413-415.) Petitioner was shaking and told Buckner that he just killed a man and would give him $2,500.00 if he hid Petitioner in his basement. (Tr. II, 415-16.) Buckner told Petitioner to get off his porch. Petitioner tried to get in the house, but ran away after Buckner pulled out a machete. (Tr. II, 416-18.) Petitioner went behind Buckner's house and

jumped the fence.  (Tr. II, 419-20.)  Belita Buckner, Jerry Buckner's wife, gave testimony consistent with her husband's.  (Tr. II, 423-25.)

Eric Brown testified that while he was sitting on Jerry Buckner's porch having a drink, a guy Brown identified as Petitioner ran up on the porch and told Jerry that he would pay him fifty dollars if he let him use the phone. (Tr. IV, 631-32.)  When Buckner told Petitioner to get off the porch, Petitioner took off running down the street.  (Tr. IV, 633.)  Brown ran after Petitioner and told him to come back.  Petitioner told Brown that he just "put him in," and referred to Nicholas Brown.  According to Brown, "put him in" is slang for shooting someone. (Tr. IV, 633-34.)  Brown and Petitioner were walking back toward the Buckner's house during their conversation, but the Buckners knew Nicholas Brown and were angry when they heard that Petitioner had shot him.  (Tr. IV, 635.)  Jerry Buckner got a machete from inside the house and told Petitioner to leave, so Petitioner took off running .  (Tr. IV, 636.)

Thomas Foster testified that he lived at the corner of Jerome and 8th Street.  On the night of May 22, 2000, Foster heard a report about shots fired at 401 North Pennsylvania on his police scanner, which was near Foster's home.  (Tr. III, 476-77.)  Shortly after he heard the report, Foster heard whistling coming from outside his home.  He looked out his front door and saw a black male and then a white male on the sidewalk directly across the street from his house.  (Tr. III, 479.) The white male was wearing an orange or yellow shirt, but Foster could not positively identify the person.  (Tr. III, 479-80.)  Foster heard the black male tell the white male to calm down and the white male said, "I just shot that n-----."  (Tr. III, 481.)

Micah Moore testified that he lived in an apartment building at 815 Jerome Street. (Tr. III, 485.)  On May 22, 2000, Moore arrived home from work at 11:10 or 11:15 p.m.  (Tr. III, 486.)  His friend, Frank, had given him a ride.  When Moore got out of the car, a man he identified

as Petitioner approached him from behind and put his hand on Moore's shoulder. (Tr. III, 486-88.) He said that he had been in a fight and needed a ride. (Tr. III, 488.) Petitioner offered Frank fifty dollars for a ride to the Lansing Mall area. Frank agreed to give him a ride and Petitioner got into the car. (Tr. III, 488-89.)

Francis Doerr testified that when he dropped off Moore at 815 Jerome, a man Doerr identified as Petitioner ran up to his truck and begged for a ride to the Lansing Mall. (Tr. III, 492.) Petitioner offered Doerr fifty dollars and told him that he had been in a fight and that the police were coming. (Tr. III, 493.) Doerr was very hesitant, so Petitioner raised his shirt to show that he did not have any weapons. (Tr. III, 493-94.) Doerr gave Petitioner a ride to the corner of Mall Drive and Saginaw. (Tr. III, 494.) Petitioner was fidgety and seemed nervous. (Tr. III, 495.) Petitioner offered Doerr another twenty dollars to drive him to East Lansing, but Doerr declined. (Tr. III, 494.) Petitioner paid Doerr fifty dollars, but Doerr gave the money to Detective Davis the following day. (Tr. III, 494-95.)

Kenneth Green testified that he was employed as a cab driver on May 23, 2000. (Tr. III, 498.) During the early morning hours, he picked-up a man he identified as Petitioner in a 7-11 parking lot at Michigan and Waverly. (*Id*.) During the drive, Green was pulled over by a police car. (Tr. III, 504-506.) After Green stopped, the police took Petitioner into custody. (Tr. III, 506.) Green had no reason to believe that Petitioner was drunk. (*Id*.)

Officer Thomas Wachowski of the East Lansing Police Department testified that he was working as a patrol officer on the night of the shooting and was informed that Petitioner was the primary suspect. (Tr. III, 581.) Wachowski was familiar with Petitioner and spotted him in the back seat of a taxi. (Tr. III, 582-83.) Wachowski conducted a traffic stop of the taxi. After back-up arrived, Wachowski directed the driver to get out of the car and moved him to a secure location.

Wachowski then gave Petitioner instructions to get out of the taxi, to walk backwards, and then to drop on his knees and put his hands on his head. (Tr. III, 586.) Petitioner followed Wachowski's instructions without difficulty. (*Id*) According to Wachowski, Petitioner's words were not slurred when he spoke. (Tr. III, 587.) Officer Tresha Rodriguez, who provided back-up for Officer Wachowski, also testified that Petitioner followed Officer Wachowski's commands without difficulty. (Tr. III, 593-94.)

 Lansing Police Officer Eric Janzen testified that he and police dog, Tiger, were dispatched to 401 North Pennsylvania following the shooting. (Tr. III, 510-512.) They were charged with trying to track a suspect that left the scene. (Tr. III, 513.) Tiger and Janzen tracked the scent to an apartment complex at 815 Jerome, where the search terminated. (Tr. III, 514-17.) Tiger and a second dog attempted to track a weapon, but were unsuccessful. (Tr. III, 518-20.)

Lansing Police Officer Matthew Ramsey testified that he assisted Officer Janzen with his canine track that ended at 815 Jerome Street. (Tr. III, 537-38.) They received some information that the suspect got into a vehicle at that location. (Tr. III, 540.) After the search for the suspect concluded, they began to search for a weapon. Because Tiger was tired, Ramsey went back to his car and got his canine, Pluto. (Tr. III, 538-39.) By that time it was raining fairly heavily, which can wash away the scent. (Tr. III, 539.) They were not successful in locating a weapon. (Tr. III, 540.)

Lansing Police Officer Robert Stanberry testified that during the early morning hours of May 23, he and his partner, Officer Blount, were sent to the East Lansing Police Department to pick-up Petitioner and take him to the Lansing Police Department. (Tr. III, 542-44.) Thereafter, the officers transported Petitioner to the jail for booking. (Tr. III, 544.) During the booking process, Stanberry noted the smell of alcohol on Petitioner's breath, but testified that Petitioner did not exhibit any other signs of intoxication. (Tr. III, 546-47.) His speech was not slurred and he had no

difficulty standing or answering the officers' questions.  (Tr. III, 547.)  The parties stipulated that Petitioner received a preliminary breath test at 4:37 a.m. on May 23, 2000, which resulting in a finding of .035.  (Tr. III, 548.)

Lansing Police Officer Darren Blount testified that he collected Petitioner's personal effects and clothing during the booking process.  (Tr. IV, 721-26.)  At that time, Petitioner was not wearing jeans or anything orange.  (Tr. IV, 726.)

Lori Baukus testified that she was a crime scene evidence technician for the Lansing Police Department assigned to 401 North Pennsylvania.  (Tr. III, 552-53.)  During the course of her work at the scene, Baukus removed a knife from the sink of the upstairs apartment and placed it into evidence.  (Tr. III, 559-60.)  Outside, Baukus observed a blood spatter on the front porch and pooling of blood between the porch and a parked truck.  (Tr. III, 562.)  In the area on and around the porch, Baukus collected a shell casing from a bullet, a bullet fragment, a sandal and a bandana.  (Tr. III, 563.)  The shell casing was a nine millimeter Luger center fire.  (Tr. III, 566.)  Baukus found drug paraphernalia in the upstairs apartment, but she did not find any illegal drugs.  (Tr. III, 574-78.)  Officer Jason Russell testified that he assisted Baukus with the search of the apartment.  (Tr. IV, 676-77.)  He did not find any illegal drugs or weapons during the search.  (Tr. IV, 677-78.)

The trial court then heard testimony outside the presence of the jury regarding the prosecution's efforts to locate Savitra McClurkin, aka Pancake, after she failed to appear as a witness at Petitioner's trial.  Detective Steven Jex of the Lansing Police Department testified that he became involved in looking for McClurkin on Friday, January 5, 2001, one day after the trial began.  (Tr. III, 603, 608.)  Jex and Detective Davis attempted to make contact with her at her residence at 1602 Reo Road, but there was no answer.  (Tr. III, 604.)  On the morning of January 8,  Jex went back to 1602

Reo Road and made contact with McClurkin's step-brother, Terry Shaw. Shaw told Jex that he had not seen McClurkin since Saturday morning (January 6). (*Id*.) Jex also made contact with McClurkin's father, Carl Mitts. Mitts told Jex that McClurkin showed up to court on Friday, January 5, but wasn't needed so she packed her bags and moved to California to live with her cousin. (Tr. III, 604.) On January 8, Jex also called Eastern High School where McClurkin had been a student. School personnel informed Jex that McClurkin had not been in school since November 15. (*Id*.) Jex was in and out of the courthouse on Friday, January 5, but did not see McClurkin. (Tr. III, 606-07.) Jex did not serve a supeona on McClurkin in this case. (Tr. III, 605.)

Assistant Prosecutor Francesco Simone testified that Savitra McClurkin appeared in his office with Lauren Solomon on Thursday, December 28, 2000. (Tr. III, 609.) Simone talked with McClurkin about her testimony that day and had some further conversation with her after that date. Simone learned from McClurkin that she was staying with her father and she gave him a phone number where he successfully contacted her. (*Id*.) Simone expected McClurkin to appear as a witness on the first day of trial, January 4. On Wednesday, January 3, McClurkin called Simone and told him that she had a problem with testifying on January 4 because she had a doctor's appointment, but said that she could testify on Friday, January 5. (Tr. III, 610.) Simone left a message for her on January 5 after she did not appear, but she did not respond. (*Id*.) Simone testified that a subpeona was served on McClurkin and the signed return card was on file in the prosecutor's office. (Tr. III, 612.)

Trixie Brown, the Victim Coordinator for the Ingham County Prosecutor's Office, testified that she tried to reach McClurkin by phone on Thursday, January 4 and Friday, January 5. On January 4, Brown left a message on the answering machine. (Tr. III, 613.) On Friday, Brown

reached McClurkin's mother and father on the phone and told them that it was imperative for McClurkin to come to court. Brown also tried the pager number provided by McClurkin, but received no response. In addition, Brown called Lauren Solomon and asked her if she could make contact with McClurkin, but Brown never heard back from Solomon or McClurkin. (*Id*.) Brown further testified that she worked with the trial witnesses on Friday, January 5 and was never informed that McClurkin had appeared that day to testify. (Tr. III, 614.)

Detective Mark Davis of the Lansing Police Department testified that he personally served McClurkin with a subpeona to testify at Petitioner's trial. (Tr. III, 615.) Davis went to McClurkin's residence twice on January 5 during breaks in the trial and called several phone and pager numbers that they had on file for her. (Tr. III, 616.) He was in court the rest of the day on January 5 and never saw McClurkin. (Tr. III, 617.)

Following arguments by counsel, the trial court concluded that the prosecution exercised due diligence in attempting to procure McClurkin for trial. (Tr. III, 620-21.) The trial court noted that based upon contacts with McClurkin, they had every reason to believe that she would appear on January 5. When she did not appear, they made every reasonable effort to make contact with her. The court further ruled that if McClurkin was not located by Monday, January 8, he would consider her unavailable and allow her preliminary examination testimony to be used at trial. (Tr. III, 621.)

Trixie Brown read McClurkin's preliminary examination testimony into the trial record. McClurkin testified that she went to the apartment at 401 North Pennsylvania on the evening of May 22, 2000. (Tr. IV, 641-42.) Petitioner already was there when she arrived. (Tr IV, 655.) Petitioner and Corwin came out on the front porch while McClurkin was on the porch smoking a

cigarette. (Tr. IV, 644, 656.) Petitioner was drinking a pint of Hennessy and chasing it with some Heineken beer. (Tr. IV, 657, 659.) McClurkin denied that she or Petitioner were smoking marijuana. (Tr. IV, 657-58.) McClurkin testified that Petitioner's eyes were glossy and she could smell alcohol on his breath, but he was acting normal. (Tr. IV., 659-60.) Petitioner poked her and then punched her in the side of the head. (Tr. IV, 644.) McClurkin was angry and Corwin, who also was on the porch, tried to intervene. Petitioner got around Corwin, picked her up and threw her into the brick wall. (*Id*.) McClurkin went upstairs to get a knife. When she came back downstairs, Petitioner drew a gun from his pants and put it in her stomach. (Tr. IV, 645-46.) McClurkin testified that she heard the gun click three times as she was holding the knife to his neck, but nothing happened. (Tr. IV, 646.) As they were struggling on the stairs, people came out of the apartment and disarmed McClurkin and Petitioner. (Tr. IV, 646-47.) Everyone went back upstairs, except Petitioner.

Sometime later, Petitioner came upstairs and stood in front of McClurkin, staring at her. (Tr. IV, 647.) White asked Petitioner to leave, but he refused. (Tr. IV, 647-48.) Brown then asked Petitioner to leave and they began to argue. (Tr. IV, 648.) Petitioner said, "[L]et's go outside and fight about it like men." Brown agreed and took of his T-shirt before going outside. McClurkin and Brown were the first two people out on the porch. Petitioner came out with his gun drawn and pointed in the direction of McClurkin and Brown. (Tr. IV, 651, 662-63.) According to McClurkin, Brown did not have any weapons on him and she did not hear him threaten Petitioner. (Tr. IV, 648, 663.) McClurkin did not think the first shot hit Brown, but the second shot hit him and caused him to fall of the porch. (Tr. IV, 651.) While Brown was laying on the ground, Petitioner walked up to him and shot him in the chest. (Tr. IV, 652-53, 666.) McClurkin was scared and ran around the

house.  (Tr. IV, 651.)  She saw Petitioner and Corwin running up Shiawassee (Tr. IV, 653.)

McClurkin testified that she and Brown were good friends, but never dated.  (Tr. IV, 669.)

Dr. Joyce Dejong testified as an expert in the field of forensic pathology.  (Tr. IV, 684-86.) Dr. Waldemar Palutke performed the autopsy on the victim, but was unavailable to testify at trial.  (Tr. IV, 686-87.)  Dr. Dejong reviewed Dr. Palutke's report and autopsy photos in preparation for her trial testimony.  (Tr. IV, 687.)  The victim sustained a gunshot wound to the upper mid chest, which passed through the aorta before exiting through his back.  (Tr. IV, 689.) There was gun powder stippling around the entry wound, which indicates that the shot was fired from relatively short range - anywhere from a few inches to a few feet.  (Tr. IV, 691-92.) The victim had a second entry wound on his left upper back.  (Tr. IV, 693.)  The bullet lodged in his spinal column, but did not hit any vital structures.  (*Id*.)  The bullet was recovered and given to Detective Jex.  (Tr. IV, 696-97.)  There was no stippling around the entrance wound on the victim's back.  (Tr. IV, 693.)  Dejong testified that the gunshot wounds resulted in the victim's death.  (Tr. IV, 694-95.) She opined that the victim could have survived the gunshot to the back if he received prompt medical attention.  (Tr. IV, 695.)  Dejong testified that THC, the chemical found in marijuana, was found in the victim's blood.  (Tr. IV, 700.)

Guadalupe Pecina testified that he found a gun while he was walking home from school on June 1, 2000.  (Tr. IV, 730-31.)  He was cutting through a construction area on Shiawassee and saw it in a pile of dirt.  (Tr. IV, 732.)  He picked it up and took it to his brother-in-law, Vilente Guzman, who turned it in to police.  (Tr. IV, 732-34.)  Guzman testified that the gun was a glock nine millimeter.  It was full of mud and had started to rust from being out in the weather.  (Tr. IV, 736.)  Guzman identified People's Exhibit #7 as the gun he turned in to police.  (Tr. IV, 737.)

Lansing Police Officer Jeffrey Winarski testified that he went to Guzman's residence and took possession of the gun. (Tr. IV, 739-41.) Winarski noted that the serial number was scratched off the gun. (Tr. IV, 741.)

Stuart Burritt testified that he was employed by the Michigan State Police and was assigned to the forensic science division of the firearms and tool marks explosive unit. (Tr. IV, 745.) Burritt testified as an expert in firearms. (Tr. IV, 747.) Burritt testified that the handgun he examined in connection with this case was a nine millimeter caliber Intratech nine model semiautomatic pistol. (Tr. IV, 750.) The gun was black with a two-and-a-half to three-inch barrel and the serial number was obliterated. According to Burritt, the gun was in poor condition; the barrel was plugged with dirt and extremely rusted. (*Id.*) Burritt testified that the serial number typically is obliterated when a gun is stolen so that it cannot be traced. (Tr. IV, 752.) Burritt testified that the bullet recovered from the victim's body and the bullet fragment and casing recovered from the crime scene could have been shot from that gun, but he could not make a conclusive determination due to the poor condition of the gun. (Tr. IV, 760-64.) Burritt testified that it was possible for a person to pull the trigger a couple of times without firing a shot. That could occur if there was no round in the chamber or as the result of some internal malfunction of the firearm. (Tr. IV, 768-69.)

Daniel Oberst of the Lansing Fire Department testified that he and Fireman David Ankney responded to 401 North Pennslyvania following the shooting. (Tr. IV, 781.) They administered medical care to an individual who had two wounds in his torso and transferred him to Sparrow Hospital. (Tr. IV, 781-83.) In accordance with department policy, Oberst conducted a brief investigation at the crime scene to ensure that the victim was not armed and there was no one that

posed a threat to fire department personnel. (Tr. IV, 782-83.) Oberst did not find any weapon on

or around the victim. (Tr. IV, 783.) The victim was still alive when he arrived at the emergency

room. (Tr. IV, 784-85.)

The defense called Dr. Norman Miller to testify as a expert in the field of addiction

psychiatry. (Tr. V, 845-864.) Miller testified that Petitioner's family paid him $3,000.00 for his

services, but the money he received did not affect his opinion. (Tr. V, 866.) In preparing his report,

Miller reviewed information from the criminal case, reviewed Petitioner's medical records and

personally examined Petitioner on November 13, 2000. (Tr. V, 867-68.) Miller found that Petitioner

had a substantial history of alcohol and drug addiction. (Tr. V, 870.) Miller opined that, at the time

of the shooting, Petitioner was addicted to alcohol, marijuana and hallucinogens. (Tr. V, 870-71.)

Petitioner told Miller that he drank two twenty-ounce Heineken beers between noon and 3:00 p.m.

on the day of the shooting. (Tr. V, 872.) That night, Petitioner smoked a marijuana blunt, drank the

majority of a fifth of Hennessy cognac and chased it with Heineken beer. (Tr. V, 872-73.) In

addition to the alcohol and marijuana, Petitioner used the hallucinogen LSD. (Tr. V, 873.) Miller

testified that the combination of substances would impair a person's perceptions and judgment and

make them less able to control their emotions and impulses. (Tr. V, 874.) At the time of the

shooting, Miller opined that Petitioner suffered from "very poor insight, very poor judgment, very

poor impulse control, very poor perception." (Tr. V, 875.) According to Miller, Petitioner did not

completely understand what was happening and could not make good decisions about how to handle

the situation. Miller further opined that Petitioner "did not have the capacity to form intent,

premeditation, or to deliberately harm the victim." (Tr. V, 876.) Given Petitioner's PBT of .035 at

4:37 a.m., Miller estimated that Petitioner blood alcohol level would have been at least .15 at the

time of the incident. (Tr. V, 881.) Miller agreed that a number of factors could have affected Petitioner's blood alcohol level, including whether Petitioner drank alcohol between the time of the incident and the time he was apprehended at 2:15 a.m., the amount of food in his stomach, the type of alcohol consumed, the manner in which it was consumed, etc. (Tr. V, 887-90.) Miller explained that alcoholics and drug addicts develop tolerance to the effect of the substances such that they may not show physical signs of intoxication. (Tr. V, 881-82.) In other words, a person can be high on drugs and alcohol and still appear to have control over their physical activities. (Tr. V, 882-83.) Dr. Miller testified that his opinion would not be changed by the fact that Petitioner had the wherewithal to hide the gun, offer someone money to hide him, offer someone money to transport him to another area of town, change out of his bloody clothes, etc. (Tr. V, 921-23.)

Jackie Marr testified that Petitioner was her biological son and that Roosevelt Corwin was her non-biological son, and she loved them both. (Tr. V, 941-42.) Marr testified that she threw Corwin out of the house in late June, after the preliminary examination in Petitioner's case, because Corwin was bringing girls home to have sex and using drugs in her house. (Tr. V, 943.) When Marr confronted Corwin about his behavior, he told her that she owed him and that she had better let him do as he wanted if she ever wanted to see Petitioner out of jail. (Tr. V, 945.) Marr was aware that Corwin had no place to go when she threw him out. (Tr. V, 948.) Marr admitted that Petitioner was addicted to marijuana and had a bad temper when he was under the influence of alcohol. (Tr. V, 945-47.) Marr testified that when Petitioner was sixteen years old she called the police because Petitioner had a hand gun. (Tr. V, 951-53.) Marr turned the gun over to the police and did not believe it was the same gun as People's Exhibit #7. (Tr. V, 952-53.)

Petitioner testified that he was eighteen years old at the time of trial. (Tr. V, 955.) He dropped out of school after eighth grade and did not attend high school. (Tr. V, 955.) Petitioner testified that be became aware of gang activity while he was still in school and had been jumped by members of the Gangster Disciples. (Tr. V, 957.) About a week before the shooting, Petitioner saw Brown beat up a guy. (Tr. V, 958-60.) Petitioner testified that he went to 401 North Pennsylvania almost every day and stayed over night about four times per week. (Tr. V, 960-61, 1072.) He frequently saw Brown there. (Tr. V, 961.) Petitioner and Brown were friends; they drank and got high together and sold drugs together. (Tr. V, 970.) Petitioner testified that before the incident, he had used acid, alcohol, weed, cocaine and had done Ecstacy a couple of times. (Tr. V, 961-62.) A lot of the people who came to 401 North Pennsylvania were gang members and drug dealers. (Tr. V, 963.) According to Petitioner, Brown and White were members of the Vice Lords. (Tr. V, 964.) Petitioner sometimes saw people at 401 North Pennsylvania, including Brown, carrying guns. (Tr. V, 968-69.) Petitioner and Brown never had any problems between them before the shooting. (Tr. V, 973-74.) Petitioner identified People's Exhibit #7 as the gun he owned on May 22, 2000. (Tr. V, 974.) Petitioner testified that he purchased the gun from Brown a couple of weeks or a month before the shooting. (Tr. V, 975.) Brown told Petitioner he had an arsenal if Petitioner ever needed any more guns. (*Id*.) Petitioner testified that he had the gun for protection. (Tr. V, 976.)

On May 22, 2000, Petitioner drank a few twenty-two ounce bottles of Heineken beer during the day. (Tr. V., 977.) Sometime after he arrived at 401 North Pennsylvania, Petitioner and Hines went to the liquor store to get alcohol and cigarettes for Petitioner and Lauren Solomon. (Tr. V, 979-80.) By the time they got back from the store, Brown had arrived and was rolling two marijuana blunts or cigars. (Tr. V, 980.) Petitioner got high from smoking the blunts. (Tr. V, 981.)

After that, he did three hits of acid, a hallocinogen. (Tr. V, 982.) According to Petitioner, it takes thirty to forty-five minutes to feel the impact of the acid. (*Id*.) At some point while Petitioner and Brown were in the kitchen together, Brown told him that he "picked-up this little 25 today " and pulled up his pant leg to reveal a little bulge in his side. (Tr. V, 983.) When McClurkin and Corwin arrived, Hines was hesitant to open the door, so Petitioner tossed his gun to him. (Tr. V, 984.)

Petitioner testified that he and Corwin went down to the front porch while McClurkin rolled a blunt. (Tr. V, 986-97.) Petitioner was drinking a fifth of Hennessy cognac and chasing it with a twenty-two ounce bottle of Heineken. (Tr. V, 988.) He drank most of the bottle of Hennessy himself. (Tr. V, 988-89.) McClurkin came down to the porch and they smoked the blunt that she had rolled. (Tr. V, 987-88.) Petitioner said something rude to McClurkin like if she was going to mess with his brother she needed to quit acting like a whore. (Tr. V, 993.) McClurkin got upset and they got into a physical altercation. (Tr. V, 993-94.) Petitioner denied hitting her, but admitted that he pushed her face with his fist, put her over his shoulder, spun her around and then put her down against the wall. (Tr. V, 994.) The next thing he knew, McClurkin had a knife to the back of his neck. (Tr. V, 995.) Petitioner pulled his gun out and put it in her stomach. (Tr. V, 996.) They wrestled around and Petitioner pulled the trigger two or three times; the gun clicked, but did not go off. (*Id*.) Petitioner testified that the gun did not go off when he pulled the trigger because it was not cocked back or was jammed. (Tr. V, 997, 1034-35, 1074.) By that point, a crowd of people was around them and Petitioner passed the gun to someone behind him. McClurkin cut him on the finger, but Petitioner restrained her so she could not cut him again. (Tr. V, 998.) Petitioner went into the first floor apartment to tend to his finger. (Tr. V, 999.) At that point, David had Petitioner's gun. (Tr. V, 999.)

When Petitioner went back upstairs, he was mad and really high. (Tr. V, 1001.) He asked Corwin to leave with him, but Corwin wanted to stay. Petitioner and McClurkin got into another argument and then White and Brown got in his face. (Tr. V, 1002-03.) Petitioner was afraid because he felt outnumbered and did not want to get into a confrontation with Brown. (Tr. V, 1003.) Petitioner suggested that just he and Brown go outside and fight. (Tr. V, 1004.) At that point, Petitioner had no intention of killing Brown. (Tr. V, 1005.) When they got down to the porch, Brown said something like, "come down here and let me show you how real n-----s do this shit." (Tr. V, 1007.) Petitioner was scared and did not want to fight Brown, so he ran into the downstairs apartment. (Tr. V, 1008.) Petitioner was closing the door when he heard Brown run up to the door "saying something about they're going to kill me." (Tr. V, 1008, 1036-37.) At the same time, David flipped the gun to Petitioner. Petitioner believed that Brown had a gun and could shoot him through the door. (Tr. V, 1009.) Petitioner put the gun through the cracked door and pulled the trigger. (Tr. V, 1008.) Petitioner fired in Brown's general direction, but just intended to scare him away, not to shoot him. (Tr. V, 1010-11, 1058-59.) After he fired the first shot, Petitioner went outside to see what happened. (Tr. V, 1009.) He saw Corwin running toward Shiawassee and then saw Brown sitting up and reaching for the same ankle where he had shown Petitioner the gun earlier that night. (Tr. V, 1010, 1049-54.) Petitioner was afraid of getting shot in the back by Brown, so he fired another shot as he turned and ran away, but did not aim at Brown. (Tr. V, 1010-13.)

Petitioner testified that he ran down Shiawassee and cut through some apartments where it was very muddy. (Tr. IV, 1014.) He ran away from the scene because he was scared and knew that the police would come. (*Id*.) Petitioner threw the gun into the dirt by the apartments. (Tr. V, 1015.) Petitioner went up on someone's porch and offered them money to hide him. (*Id*.) After that, Petitioner gave a guy in a truck fifty dollars to take him to the Lansing Mall. (Tr. V, 1016.)

Petitioner eventually made his way to the apartment of a girl that he knew and used her phone to call David Lesoski's residence. (Tr. V, 1018.) Petitioner removed his bloody shirt and the girl loaned him a black and yellow nylon jacket. (Tr. V, 1020.) He later disposed of the bloody shirt in a dumpster. Petitioner planned to turn himself in, but wanted to talk to his mother first, so he asked the girl to call him a cab. (Tr. V, 1019.) Petitioner asked the cab driver to drive past 401 North Pennsylvania. (Tr. V, 1062.)

Petitioner testified that he called Corwin and told him that he needed to testify that Brown had a gun because he thought Corwin saw the same thing as Petitioner when Brown reached for his ankle. (Tr. V, 1061.) Petitioner admitted that he had a very bad temper when he was under the influence and had sought help for his alcohol problem and bad temper. (Tr. V, 1064-65.) Petitioner testified that he had female visitors when he lived at his mother's home. He also had smoked marijuana in the house, but she never caught him. (Tr. V, 1062.) Petitioner testified that his memory of events was better at the time of trial than immediately after the incident. (Tr. V, 992, 1016, 1026-28.)

At the conclusion of trial on Janaury 12, 2001, the jury found Petitioner guilty of the lesser offense of second-degree murder and felony-firearm. (Tr. VII, 1182.) On March 9, 2001, Petitioner was sentenced to serve a prison term of 220 to 360 months for the murder conviction and a consecutive two-years term for the felony-firearm conviction. (Sentencing Transcript, (S. Tr.), 22, docket #23.)

B.     **Motion for New Trial**

Petitioner filed a motion for new trial. (*See* Def.'s Mot. for New Trial, docket #26.) In an amended opinion and order issued on June 1, 2005, the trial court denied Petitioner's motion. (*See* Ingham County Circuit Court Am. Op. and Ord., docket #25.)

## C.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on June 29, 2005, raised the same eight issues presented in this application for habeas corpus relief.  (*See* Def.-Appellant's Br. on Appeal, docket #27.)  By unpublished opinion issued on February 21, 2006, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (*See* 2/21/06 Mich. Ct. App. Opinion (MCOA Op.), docket #27.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same eight claims raised before and rejected by the Michigan Court of Appeals.   By order entered October 21, 2006, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Ord., docket #28.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court

of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at

411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

### Discussion

**A.      Trial Court's Exclusion of Evidence: Grounds I and VI**

1.      *Exclusion of evidence relevant to self-defense*

In his first ground for habeas corpus relief Petitioner claims that the trial court erred by excluding evidence relevant to his claim of self-defense. Specifically, Petitioner contends that the trial court improperly limited testimony regarding the victim's history of violence, which impaired Petitioner's claim of self-defense. He further claims that the trial court's ruling violated M.R.E. 404(a)(2) and 405.[2]

At trial, defense counsel sought to elicit testimony from witnesses regarding the victim's reputation for violence. After hearing arguments from counsel outside the presence of the jury, the trial court ruled that defense counsel could elicit testimony regarding the victim's reputation or character for violence, but could not offer evidence of specific acts of violence. (Tr. III, 532-33.) On direct appeal, the Michigan Court of Appeals found that any error committed by the trial court was harmless:

---

[2] M.R.E. 404(a)(2) provides that evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith, except "[w]hen self-defense is an issue in a charge of homicide, evidence of a trait or character for aggression of the alleged victim of the crime offered by an accused . . . ."

M.R.E. 405 provides:
(a) Reputation or Opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of opinion. On cross-examination, inquiry is allowable into reports of relevant specific instances of conduct.

(b) Specific Instances of Conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct.

In considering whether to admit testimony concerning Brown's violent history, the trial court ruled that "reputation as to violence and/or aggressiveness may be admitted. Evidence of specific acts may not." Defendant contends that the trial court should have allowed defense counsel to inquire of police witness and of defendant about specific acts of violence perpetrated by Brown. Defendant submits that this type of questioning was pertinent "to show that [d]efendant legitimately feared Nicholas Brown not only because of his violent reputation, but because of his past violent actions." Defendant also submits that the questioning was pertinent to help show "that Brown was the aggressor."

In *People v Harris*, 458 Mich 310, 319; 583 NW2d 680 (1998), the Supreme Court made clear that evidence of specific instances of violent conduct on the part of the victim are not admissible to prove that the victim was the aggressor in an altercation that results in a self-defense claim. Accordingly, defendant is incorrect in arguing otherwise. The *Harris* Court, citing *People v Cooper*, 73 Mich App 660, 664; 252 NW2d 564 (1977), also indicated, however, that "specific acts . . . may be shown to establish reasonable apprehension of harm." *Harris, supra* at 319. Obviously, in order for these specific acts to be relevant for such a purpose, they would have to be known about by defendant. There is no reason from the existing record to surmise that the various police witnesses had knowledge of both Brown's previous acts of violence and of defendant's knowledge regarding those acts. Therefore, the trial court did not err in precluding defense counsel from asking the police witnesses whether they knew of specific acts of violence committed by Brown.

To the extent that the trial court failed to allow defense counsel to ask defendant about specific acts of violence perpetrated by Brown, we conclude that any error was harmless. Indeed, it does not affirmatively appear to us "that it is more probable than not that the error was outcome determinative." *People v Mateo*, 460 Mich 484, 495-496; 596 NW2d 607 (1999). Indeed, defendant testified that, at the time of the shooting, he saw Brown reaching for his ankle, where a gun had been located on an earlier occasion. Defendant also testified that he bought the gun used in the shooting from Brown. He further testified that Brown was a violent person because of "the way he acts. The fight I seen him in, the problems that me and him had." Moreover, multiple witnesses testified that Brown threatened to kill defendant on the evening in question, and defendant clearly testified that he shot Brown out of fear. Through this evidence, the jury was sufficiently informed of defendant's state of mind at the time of the shooting. We cannot conclude that additional evidence of specific acts of violence perpetrated by Brown would have affected the outcome of the case, and defendant was not deprived of presenting his claim of self defense.[1]

<div style="border-top: 1px solid; width: 30%;"></div>

1.   Defendant, in the course of his somewhat disjointed argument, also suggests that the trial court erroneously prevented defense counsel from inquiring of witnesses other than defendant about Brown's reputation for violence. The record does not support defendant's assertion. Indeed, the trial court ruled that "reputation

as to violence and/or aggressiveness may be admitted" and did not rule that this evidence could come in only through the testimony of defendant. In fact, the court went on to discuss how defense counsel could lay a foundation for asking various witnesses about Brown's reputation for violence.

(MCOA Op., 3-4.)

To the extent Petitioner claims that the trial court's decision violated Michigan law or the Michigan Rules of Evidence, such claims are not cognizable for purposes of federal habeas corpus review. The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v.*

*Kentucky*, 476 U.S. 683, 690 (1986) (citations and internal quotation marks omitted). The Sixth

Circuit recently explained:

> [A] "meaningful opportunity" is not "every opportunity," and relevant evidence is frequently excluded from trial. Trial judges must make "dozens, sometimes hundreds" of evidentiary decisions throughout the course of a typical case, and rarely are these of constitutional significance: "the Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive . . ., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Crane*, 476 U.S. at 689-90, 106 S. Ct. 2142 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)) (alterations and omissions in original). But while the Constitution leaves much in the hands of the trial judge, "an essential component of procedural fairness is an opportunity to be heard." *Id.* at 690, 106 S. Ct. 2142.

*Gagne v. Booker*, 596 F.3d 335, 340-41 (6th Cir. 2010). A proper inquiry into the constitutionality

of a trial court's decision to exclude evidence begins with considering the relevancy and cumulative

nature of the excluded evidence, and the extent to which it was "central" or "indispensable" to the

defense. *Id.* at 341. Against this courts must balance the state's interests in enforcing the evidentiary

rule on which the exclusion was based. *Id.*

The Michigan Court of Appeals interpreted the trial court's ruling as allowing

testimony from any witness regarding the victim's reputation for violence, but excluding evidence

of specific acts of violence. Petitioner contends, however, that the trial court ruled that reputation

evidence would be allowed only from Petitioner and that specific acts of violence by Brown,

including his 1993 criminal conviction for assault with a dangerous weapon would not be

admissible. Petitioner's interpretation of the trial court's ruling is not supported by the record. After

making its ruling, the trial court discussed how defense counsel should lay a foundation before

asking witnesses about the victim's character for violence. (Tr. III, 533-34.) Defense counsel later

attempted to ask Police Officer Richard Thomas about Petitioner's reputation in the community.

Thomas testified that the victim was known as a drug dealer, but Thomas was not aware of his reputation for violence. (Tr. III, 600.) After a side bar, the trial court asked the jury to disregard Thomas' statement that the victim was known as a drug dealer. (Tr. III, 600.) While the trial court did not provide a reason for its decision on the record, the officer's testimony that Petitioner was a drug dealer, which did not concern the victim's reputation for violence, was irrelevant. Thus, based on record, it appears that defense counsel was free to question witnesses regarding Brown's character for violence.

Regardless of the trial court's ruling, the defense was permitted to present ample testimony in support of their theory of self-defense. Petitioner testified that Brown was a member of the Vice Lords and that he saw Brown beat up a guys about a week before the shooting. (Tr. V, 958-60, 964).[3] Petitioner further testified that he purchased the gun he used in the shooting from Brown and that Brown told him that he had an arsenal if Petitioner ever needed more guns. (Tr. V, 975.) On the night of the shooting, Petitioner testified that while he and Brown were in the kitchen together, Brown told him that he "picked -up this little 25 today" and pulled up his pant leg to reveal a little bulge. (Tr. V, 983.) Petitioner told the jury that he was afraid to fight Brown and that Brown said something about killing him just before Petitioner fired the first shot. (Tr. V, 1008, 1036-37.) Petitioner testified that after he fired the first shot and went outside, he saw Brown sitting up and reaching for the same ankle where Petitioner believed he had a gun. (Tr. V, 1009-10, 1049-54.) Petitioner testified that he was afraid of getting shot in the back by Brown, so he fired another shot as he turned and ran away. (Tr. V, 1010-13.)

---

[3] Despite the trial court's ruling, Petitioner was allowed to testify regarding a specific instance of violence by Brown, i.e., that Brown beat up a guys about a week before the shooting.

In addition to Petitioner's testimony, Miranda and David Lesoski, Roosevelt Corwin and Brandon White testified that they heard Brown threaten to kill Petitioner and his brother moments before he was shot. (Tr. II, 272-73, 313, 398, 456.) Witnesses also testified that Brown took off his shirt and jewelry before the fight and made statements like, "let me show you how real n-----s do this shit." (Tr. II, 396; 456-57.)

In light of the evidence presented in support of Petitioner's theory of self-defense, the trial court's ruling did not deprive Petitioner of a fundamentally fair trial. While the trial court excluded specific instances of conduct, the only specific instance of violence raised by Petitioner was the victim's 1993 conviction for assault with a dangerous weapon. (Tr. III, 530.) This one instance of specific conduct, which occurred seven years before the shooting at issue in this case, clearly was not "central" or "indispensable" to the defense. Moreover, Petitioner's self-defense theory had little chance of success in light of undisputed evidence that the victim was not armed at the time of the shooting. Also damaging to Petitioner's theory of self-defense was testimony from witnesses that after shooting the victim once, Petitioner approached the victim and shot him a second time as he lay on the ground. (Tr. I, 187-92; Tr. II, 399-408; Tr. IV, 651-53.) Such testimony was consistent with medical evidence that the victim was shot once in the back and a second time in the chest from short range. (Tr. IV, 687-695.) In addition, Petitioner admitted that he suggested fighting the victim and that he (Petitioner) had a very bad temper when he was under the influence of drugs and alcohol. (Tr. V, 1004, 1064-65.) Therefore, I cannot find that the decision of the Michigan Court of Appeals was not an unreasonable application of clearly established Supreme Court precedent.

2. *Exclusion of Francis Doer's testimony that Petitioner looked scared*

In his sixth ground for habeas corpus relief, Petitioner claims that the trial court improperly excluded relevant defense testimony while admitting similar evidence on behalf of the

prosecution. Specifically, Petitioner alleges that the trial court erred in not allowing prosecution witness Francis Doer to testify that Petitioner looked scared when Doerr gave Petitioner a ride after the shooting. The following exchange occurred during cross-examination of Mr. Doerr by the prosecutor:

Q:     Mr. Doerr, you indicated that you were very scared that evening, correct?

A:     Yeah.

Q:     Isn't it also true that the white -- Craig, the person you pointed out, was also very scared?

A:     He was fidgety and nervous acting and that's -- you know, being from a stranger, you know, he wanted in my truck real bad. He just wanted to get out of there.

Q:     Is it a fair statement that Craig appeared to be very scared as well.

> Ms. Price [Prosecutor]: Your Honor, I'm going to object to that because I don't know how he can equivocate between his fear and someone else's.
>
> The Court: You can ask him to describe what he saw, but you're asking for a conclusion, so you can't do that.
>
> Mr. Tomal [Defense Counsel]: I'll withdraw the question.

(Tr. III, 495-96.) The Michigan Court of Appeals found that any error on the part of the trial court in excluding that portion of Doerr's testimony was harmless. The court of appeals further held that Petitioner did not sufficiently develop his claim that the trial court allowed the prosecutor to introduce evidence similar to evidence that was not allowed to be introduced by defense counsel, and, thus, the claim was waived. (MCOA Op., 8.)

As discussed above, a trial court's evidentiary rulings are not grounds for federal habeas corpus relief unless they rise to the level of due process violation. *Seymour*, 224 F.3d at 552.

The trial court's ruling clearly did not result in the denial of a fundamentally fair trial. Doerr testified that Petitioner was "fidgety and nervous acting." As stated by the Michigan Court of Appeals, "It is difficult to discern how an additional statement from Doerr that defendant was scared would have contributed to a determination of defendant's guilt or innocence." (MCOA Op., 8.) Moreover, whether Petitioner was scared when he encountered Doerr was not relevant to Petitioner's claim of self-defense as the shooting had already occurred and Petitioner had fled the scene. Consequently, Petitioner's sixth ground for habeas relief is without merit.

To the extent Petitioner claims that the trial court allowed the prosecutor to introduce evidence similar to evidence that was not allowed to be introduced by defense counsel, his claim is procedurally defaulted. When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). Here, the Michigan Court of Appeals deemed the issue waived as a result of inadequate briefing. (MCOA Op., 8 n.10) (citing *People v. Watson*, 629 N.W. 2d 411, 421-22 (2001)).

When a petitioner has procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Petitioner does not argue cause and prejudice for his default nor does he assert a claim of actual innocence. Accordingly, his claim is barred from habeas corpus review.

**B.      Trial Court's Denial of Jury Instructions on the Lesser Offenses of Manslaughter and Reckless Discharge of a Firearm Resulting in Death: Ground II**

In his second ground for habeas corpus relief, Petitioner contends that he was denied a fair trial when the trial court refused to instruct the jury on the lesser offenses of reckless discharge of a firearm causing death, common law involuntary manslaughter, statutory involuntary manslaughter and voluntary manslaughter. Petitioner contends that there was evidence to support the instructions. He further contends that because the jury found him guilty of second-degree murder, the only lesser offense given by the court, there is a reasonable probability that the jury might have chosen an even lesser offense had the instructions been provided.

The trial court refused to give the instructions because they were not supported by the evidence. The trial court stated:

[T]he Defendant testified he did not – he did not testify that he shot the victim in the heat of passion. He testified that he fired the second shot in the direction of the Defendant [sic] out of fear because he saw Defendant [sic] reaching for – I'm sorry, because he saw the victim reaching for his ankle which the Defendant testified meant that the victim was reaching for a gun.

If the jury believes this testimony, the Defendant will be found not guilty because the killing was justified. If the jury believes part of the Defendant's testimony, the part in which he said he only intended to fire in the direction of the victim, but the jury disbelieves the Defendant's statement that he acted in fear of the victim reaching for a gun, then the Defendant will be found guilty of second degree murder.

There is no testimony to support the proposition that the discharge of the firearm was either accidental or done in the heat of passion.

(Tr. VI, 1104-05.) The Michigan Court of Appeals found no error in the trial court's ruling. (MCOA Op., 4-6.)

The Sixth Circuit Court of Appeals, sitting en banc, has held that the failure to give an instruction on a lesser-included offense, even when requested by counsel, is not of the "character or magnitude which should be cognizable on collateral attack." *Bagby v. Sowders*, 894 F.2d 792, 797 (6th Cir. 1990) (plurality opinion) (en banc). The *Bagby* court held that failure to instruct on lesser-included offenses in a noncapital case does not by itself result in a miscarriage of justice in violation of due process of law. *Id.*; *accord Crane v. Sparkman*, No. 97-5321, 1998 WL 598725, at *6 (6th Cir. Aug. 27, 1998); *Johnson v. Abramajtys*, No. 91-1465, 1991 WL 270829, at *9 (6th Cir. 1991). Consequently, Petitioner's claim that there was constitutional error in the trial court's failure to instruct on lesser offenses is without merit.

### C.    Failure to Produce Witness Savitra McClurkin for Trial: Ground III

In his third ground for habeas corpus relief, Petitioner contends that the trial court violated his Sixth Amendment right to confrontation when it found that the prosecutor exercised due

diligence in attempting to secure the presence of Savitra McClurkin, aka, Pancake, for trial. As set forth in the statement of facts, the trial court heard testimony outside the presence of the jury regarding the prosecution's efforts to obtain McClurkin's presence at trial. The trial court concluded that the prosecution exercised due diligence in attempting to procure McClurkin for trial. (Tr. III, 620-21.) The trial court noted that based upon contacts with McClurkin leading up to the trial, the prosecution had every reason to believe that she would appear to testify on January 5. The trial court further concluded that when McClurkin did not appear on January 5, the prosecution made every reasonable effort to locate her. (Tr. III, 621.) As a result of the trial court's ruling, McClurkin's preliminary examination testimony was read into the record.

The Confrontation Clause provides "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. This right applies to prosecutions in both federal and state courts. *Crawford v. Washington*, 541 U.S. 36, 42 (2004). The test for evaluating Confrontation Clause claims was originally set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980). Under the two-prong test set forth in *Roberts* a declarant's out-of-court statement was not admissible unless the declarant is unavailable and the statement is admissible only if it bears adequate "indicia of reliability." *Id.* at 66. The second prong was recently abrogated with respect to testimonial statements by *Crawford v. Washington*, 541 U.S. 36 (2004), where the Court held that testimonial out-of-court statements by witnesses are barred under the Confrontation Clause, unless: (1) the witnesses are unavailable, and (2) the defendant had a prior opportunity to cross-examine them, regardless of whether such statements are deemed reliable.[4] However, *Crawford* did not alter the "unavailability" analysis, which is at issue in this case.

---

[4] Petitioner case was pending on appeal in the Michigan Court of Appeals when *Crawford* was decided.

In *Roberts*, the Court explained that "a witness is not 'unavailable' for purposes of . . . the exception to the confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his [or her] presence at trial." 448 U.S. at 74 (citing *Barber v. Page*, 390 U.S. 719, 724-725 (1968)). "The lengths to which the prosecution must go to produce a witness, however, is a question of reasonableness." *Winn v. Renico*, 175 F. App'x 728, 733 (6th Cir. 2006) (citing *California v. Green*, 399 U.S. 149, 189, n. 22 (1970) (concurring opinion, citing *Barber*)). "The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness . . . . The prosecution bears the burden of proof in this regard. *Id.* (citations omitted).

The Michigan Court of Appeals assumed without deciding that the trial court abused its discretion in ruling that due diligence had been shown, but concluded that any error was harmless in light of the testimony provided by other witnesses. The court stated:

> Defendant next argues that the trial court erred in determining that the police exercised due diligence in attempting to secure the presence of Savitra McClurkin for trial. Defendant contends that McClurkin's preliminary examination testimony should not have been read at trial because of the lack of due diligence. *See People v Bean*, 457 Mich 677, 682-683; 580 NW2d 390 (1998). We review this issue for an abuse of discretion. See id. at 684-685. Here, even assuming, without deciding, that the trial court abused its discretion in ruling that due diligence had been shown, we conclude that the error was harmless beyond a reasonable doubt, in light of the testimony provided by other witnesses.

> Solomon testified that she saw defendant aim the gun at Brown, kneel, and shoot Brown even after Brown had already been shot. Corwin testified that defendant started the altercation with Brown and shot Brown, twice, even though Brown was carrying no weapons. Hines also testified that he saw no weapon on Brown on the day in question. Hines additionally testified that he saw defendant restraining McClurkin before defendant's altercation with Brown. Defendant emphasizes that McClurkin, in her preliminary examination testimony, stated that she did not hear Brown threaten defendant at the time of the shooting. However, two other prosecution witnesses admitted that Brown did threaten defendant at the time. Under

- 40 -

the circumstances, we conclude, beyond a reasonable doubt, that there is no reasonable possibility that McClurkin's preliminary examination testimony affected the verdict. *People v Anderson*, 446 Mich 392, 406; 521 NW2d 538 (1994). Reversal is unwarranted.

(MCOA Op., 6.)

On habeas review, a court must assess harmlessness under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), regardless of whether the state appellate court recognized the error and reviewed it for harmlessness. *See Hargrave* v. McKee, 248 F. App'x 718, 728 (6th Cir. 2007) (citing *Fry v. Pliler*, 551 U.S. 112 2328 (2007)); s*ee also Vasquez v Jones*, 496 F.3d 564, 574-75 (6th Cir. 2007). The *Brecht* standard requires the Court to consider whether the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result. *Brecht*, 507 U.S. at 638.

Petitioner argues that McClurkin's preliminary examination testimony was the most damaging witness testimony against him. Petitioner cites McClurkin's testimony that Petitioner put his gun in her stomach and pulled the trigger three times, that it was Petitioner's idea to fight the victim, that Petitioner knelt down to fire the second fatal shot, that the victim did not threaten Petitioner, and that the victim did not have a weapon. However, the Michigan Court of appeals correctly concluded that any error in admitting McClurkin's preliminary examination testimony was harmless in light of testimony provided by other witnesses. Several other witnesses testified regarding the altercation between McClurkin and Petitioner. (Tr. I, 178-180; Tr. II, 230-234, 338-342, 440-444.) Brandon White testified that he saw Petitioner holding a gun to McClurkin's side and that Petitioner was trying to pull the trigger, but the gun did not go off. (Tr. II, 464-65.) In addition, Petitioner admitted that he pulled his gun out and put it in McClurkin's stomach. (Tr. V, 996.) According to Petitioner, they wrestled around and Petitioner pulled the trigger two or three

times; the gun clicked, but did not go off because it was not cocked back or was jammed. (Tr. V, 997, 1034-35, 1074.) Thus, McClurkin's testimony was cumulative of that provided by other witnesses and Petitioner.

With regard to McClurkin's testimony that Petitioner was the one who proposed the fight with Brown, Roosevelt Corwin, Petitioner's foster brother, testified that Petitioner instigated the fight with Brown by saying, "Let's go outside and take care of this like men." (Tr. II, 353.) In addition, Petitioner admitted that he felt outnumbered in the apartment, so he suggested that he and Brown go outside alone to fight. (Tr. V, 1003-1005.) Likewise, numerous witnesses testified that Brown was unarmed when he was shot by Petitioner. (Tr. I, 188; Tr. II, 240, 364, 457.) Only Petitioner testified that he believed that Brown was armed. Both McClurkin and Solomon testified that they did not hear the victim threaten Petitioner. (Tr. I, 187-88; Tr. IV, 648.) However, Miranda and David Lesoski, Corwin and White all testified that Brown threatened to kill Petitioner and his brother just before Petitioner shot him. (Tr. II, 272-73, 313I, 398, 456.) In addition to McClurkin, Solomon testified that Petitioner knelt down before he fired the second shot. (Tr. II, 189-92, 198-99.) Corwin also testified that Petitioner approached the victim and fired the second shot while the victim was laying on the ground. (Tr. II, 364-66, 407-08.) Because McClurkin's testimony was largely cumulative of other witnesses' testimony, I cannot find that the constitutional error, if any, had a "substantial and injurious effect" on the result.

### D.     Prosecutorial Misconduct: Grounds IV, V and VII

Petitioner raises three claims of prosecutorial misconduct. In his fourth ground for habeas corpus relief, Petitioner contends that the prosecutor improperly attacked his expert, Dr. Miller, during closing arguments. In Ground V, Petitioner argues that the prosecutor denied

Petitioner's Fourteenth Amendment due process rights and his Sixth Amendment right to confrontation by asserting facts not supported by the evidence during his closing argument. Finally, in his seventh ground for habeas corpus relief, Petitioner contends that he was prejudiced by the prosecutor's leading questions regarding the character of the people involved in the incident.

1.    *Procedural Default*

Respondent maintains that Grounds IV, V and VII are procedurally defaulted because Petitioner failed to object to the prosecutor's alleged misconduct at trial. Indeed, the Michigan Court of Appeals found that Petitioner failed to preserve his claims by making objections, but reviewed the claims for plain error. However, the Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits. *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)). *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

2.      *Attack on Dr. Miller*

Petitioner argues in Ground IV that the prosecutor belittled Dr. Miller and thereby committed misconduct requiring reversal. Petitioner specifically objects to the following statements made by the prosecutor during her closing argument:

> Yesterday you got an opportunity to hear from [Petitioner's] expert, Doctor Miller. Doctor law student Miller.[5] Doctor Miller who was paid $3,000 to testify by the Marrs. I submit to you he pretty much gave them their money's worth because he didn't let any of the facts of this case interfere with his decision.

(Tr. VI, 1119.) The Michigan Court of Appeals found that the prosecutor's comments about Dr. Miller did not result in plain error, stating:

> A prosecutor may comment on the fact that an expert witness has been paid, as long as that fact has been introduced into evidence. *People v Williams*, 162 Mich App 542, 549; 414 NW2d 139 (1987). Here, the fact that Dr. Miller had been paid was indeed introduced into evidence. Moreover, the prosecutor, after making the challenged comments, went on to explain how the evidence at trial belied Dr. Miller's conclusions about defendant's level of intoxication on the night in question. In other words, the prosecutor connected her comments about Dr. Miller to the evidence. Moreover, we note that a prosecutor is "not required to phrase arguments in the blandest of all possible terms." *People v Ullah*, 216 Mich App 669, 678; 550 NW2d 568 (1996). Under the circumstances, we simply cannot find plain error, much less *outcome-determinative* plain error, in connection with the challenged comments.

(MCOA Op. 6-7) (emphasis in original.)

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability

---

[5] During her voir dire of Dr. Miller, the prosecutor elicited that Dr. Miller was attending law school at the time of trial.

of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id.* at 12-13 (1985); *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

Petitioner cannot show that he was denied a fair trial as the result of the prosecutor's comments regarding Dr. Miller. When reviewing claims of prosecutorial misconduct during closing argument, the court must "afford wide latitude to a prosecutor during closing argument, analyzing disputed comments in the context of the trial as a whole and recognizing that inappropriate comments alone do not justify reversal where the proceedings were 'otherwise fair.'" *United States v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008) (quoting *United States v. Young*, 470 U.S. 1, 11 (1985), and citing *United States v. Hitow*, 889 F.2d 1573, 1579 (6th Cir. 1989)). The facts that Dr. Miller was a law student and that Petitioner's family paid for his testimony were evidence in the case. In addition, the complained of comments about Dr. Miller were relatively brief and isolated in the context of the prosecutor's closing argument. Furthermore, as discussed by the Michigan Court of Appeals, the prosecutor connected her comments about Dr. Miller to the evidence presented in the case. The prosecutor was permitted to argue how Dr. Miller's opinion regarding Petitioner's level of intoxication was inconsistent with other evidence introduced at trial. Finally, the evidence supporting Petitioner's second-degree murder conviction was very strong. It was undisputed that

Petitioner shot the victim, who was unarmed, two times. While the victim lay on the ground after the first shot hit him in the shoulder, Petitioner approached and inflicted a second shot in the victim's chest. Consequently, the decision of the Michigan Court of Appeals was a reasonable application of Supreme Court precedent.

### 3.     *Assertion of Facts not in Evidence*

In Ground V, Petitioner contends that the prosecutor violated his due process rights and his right of confrontation by arguing facts in closing arguments that were not supported by the evidence. Specifically, Petitioner argues that the prosecutor improperly stated, "Before Mr. Marr shot at Brown for the first time, he had pulled the slide. Pulling the slide gave him time to think about it. Pulling the slide shows premeditation and deliberation." (Tr. VI, 1129.) Petitioner further claims that the prosecutor asserted facts not in evidence when he said, "This doctor [Dr. Miller] said it didn't matter to him that Roosevelt Corwin has now said everything at the preliminary examination was a lie." (Tr. VI, 1120.)

The Michigan Court of Appeals found no plain error as a result of the prosecutor's alleged misconduct. The court stated:

> Defendant next argues that the prosecutor committed misconduct requiring reversal by arguing facts not in evidence during closing arguments. Defendant first contends that the prosecutor improperly stated, "before the [d]efendant shot at [Brown] for the first time, he had pulled the slide.[7] Pulling the slide gave him time to think about it. Pulling the slide shows premeditation and deliberation." Defendant contends that there was no evidence that defendant pulled the slide of the gun because the gun had been in the possession of different people on the night of the shooting.

> Defendant did not object to these statements by the prosecutor, and we therefore review this issue using the plain error doctrine. *Watson, supra* at 586. While it is true that there was no evidence that defendant pulled the slide for the first shot at Brown, it is a reasonable inference from the evidence that defendant pulled the

slide before shooting Brown a second time.[8] Therefore, the prosecutor's statement that defendant had "time to think about it" holds credence. Under the circumstances, we conclude that the prosecutor's error simply did not affect the outcome of the case. *Id.*

Defendant additionally contends that the prosecutor erred in stating, "This doctor [Dr. Miller] said it didn't matter to him that Roosevelt Corwin has now said everything at the preliminary examination was a lie."[9] Once again, defendant failed to object to the challenged statement by the prosecutor, and our review is for outcome-determinative plain error. *Id.*

In his appellate brief, defendant does not focus on the prosecutor's comment about Dr. Miller but instead argues that there was no evidence that "everything" Corwin stated at the preliminary examination was a lie. However, Corwin, in admitting that he lied at the preliminary examination, stated, "you know I lied and I know I lied and – okay, you know I was lying and I'm not lying any more, so you can keep throwing up lies that I said and I'm telling you right now I said them." Given Corwin's broad statements about lying at the preliminary examination, we simply cannot conclude that the prosecutor's statement about "everything" being a lie amounted to outcome-determinative plain error. Reversal is unwarranted.

[7] The prosecutor, in referring to "pulling the slide," was referring to "cocking" the gun.

[8] A witness at trial testified that the gun used in the shooting was a semiautomatic pistol that needed to be "cocked" before each shot.

[9] Corwin testified at trial that he lied at the preliminary examination in order to portray defendant, whom he considered a brother, in a favorable light. Dr. Miller testified that he based his opinions regarding defendant's level of intoxication on, in part, the preliminary examination testimony. He stated that he would need to know the specifics of which testimony had changed before deciding whether his ultimate conclusion about defendant's intoxication level remained proper in light of the changed testimony.

(MCOA Op. 7-8.)

The Michigan Court of Appeals' resolution of Petitioner's claim was eminently reasonable. As noted by the court of appeals, Stuart Burritt of the Michigan State Police testified that the semiautomatic pistol used in the shooting had be cocked before it would fire. (Tr. IV, 753.) Thus, any error committed by the prosecutor in stating that Petitioner pulled the slide before firing the first shot did not affect the outcome of the trial as Petitioner must have pulled the slide or cocked

the gun before delivering the fatal second shot. In addition, the reason for the prosecutor's statement was to show the deliberation and premeditation required for the charge of first-degree murder. However, the jury found Petitioner guilty of the lesser offense of second-degree murder, which did not require a finding of deliberation and premeditation. Consequently, the prosecutor's comment did not negatively impact the defense.

Similarly, Petitioner was not denied a fair trial by the prosecutor's characterization of Roosevelt Corwin's trial testimony that "everything" he said at the preliminary examination was a lie. As discussed by the Michigan Court of Appeals, Corwin made very broad statements at trial about lying at the preliminary examination. (Tr. II, 410.) He also testified at trial that he testified at the preliminary examination in the light most favorable to Petitioner and tried to leave out important details. (Tr. II, 402-03.) In closing arguments, prosecutors may argue that a jury can draw reasonable inferences from the evidence presented at trial. *See United States v. Roach*, 502 F.3d 425, 434 (6th Cir. 2007). Even if the prosecutor exaggerated Corwin's testimony regarding his untruthfulness at preliminary examination, the prosecutor's comment did not rise to the level of a due process violation. Taken in context, the prosecutor was arguing that Dr. Miller's opinion that Petitioner could not form the intent to kill was based upon incomplete or inaccurate information, including Corwin's preliminary examination testimony. Dr. Miller testified that the preliminary examination transcript was one of the items he relied upon in preparing his report and reaching his conclusions about Petitioner's state of mind at the time of the shooting. (Tr V, 867-68.) It was not improper for the prosecutor to ask the jury to infer from the evidence that Dr. Miller's opinion was flawed because the facts upon which he formed his opinion were incomplete or inaccurate.

Consequently, the court of appeals reasonably determined that Petitioner was not a fair trial as a result of the prosecutor's comment.

4. *Leading questions regarding the character of the people involved in the incident*

Petitioner argues in Ground VII that the prosecutor committed misconduct requiring reversal by asking leading questions regarding the character of people involved in the incident, including Petitioner. Defendant first complains that the prosecutor asked Corwin, "Sort of a gentle guy, isn't he?" in reference to Lloyd Ali Hines, aka Ali. (Tr. II, 338.) Defendant also complains that the prosecutor improperly asked Corwin, "Bad temper on [Petitioner] here?" and "[Petitioner] gets nasty when people cross him, doesn't he?" (Tr. II, 349-50.) Petitioner claims that the prosecutor's leading questions violated M.R.E. 404(a)(1) and his rights to due process and a fair trial. The Michigan Court of Appeals found that any error committed by the prosecutor did not amount to outcome-determinative plain error. (MCOA Op., 8.)

Petitioner's claim is without merit. The prosecutor's question regarding Lloyd Hines was without consequence as Hines' temperament was not a central issue at trial. The prosecutor's leading questions to Corwin about Petitioner's bad temper also did not deprive Petitioner of a fair trial in light of the other testimony presented at trial. Corwin gave testimony on cross-examination that Petitioner must have been really drunk because it was unusual for him to push Corwin around. (Tr. II, 378-39.) He also testified that Petitioner usually was "kind-hearted" even when he was drunk and that he wasn't acting normal that night. (Tr. II, 379-80.) Moreover, the character testimony that the prosecutor elicited from Corwin was cumulative of evidence presented by other witnesses. Both Petitioner and his mother testified that he had a very bad temper when he was under the influence.

(Tr. V, 945-47, 1064-65.)  Several witnesses testified regarding an altercation that Petitioner got into

with McClurkin not long before the shooting occurred.  Petitioner admitted that he got into a fight

with McClurkin after he insulted her.  (Tr. V, 993-94.)  During the altercation, Petitioner testified

that he put a gun in McClurkin's stomach and pulled the trigger two or three times, although the gun

did not fire.  (Tr. V, 996-97.)  In addition, all of the witnesses to the shooting testified that Petitioner

and the victim were arguing and posturing before the shots were fired.  Petitioner testified that he

was mad and really high when he went back up to the apartment after the fight with McClurkin.  (Tr.

V, 1001.)  Petitioner testified that he got into another argument with McClurkin and that White and

the victim "got in his face."  (Tr. V, 1002-03.)  Petitioner also admitted that he challenged the victim

to the fight.  (Tr. V, 1004.)  Considering the evidence in the case, the decision of the Michigan Court

of Appeals was a reasonable application of Supreme Court precedent.

### E.    Ineffective Assistance of Counsel: Ground VIII

In his Eighth Ground for habeas corpus relief, Petitioner claims that he was denied

the effective assistance of trial counsel.  In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984),

the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance

of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1)

that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's

deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair

outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption

that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.

The defendant bears the burden of overcoming the presumption that the challenged action might be

considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also*

*Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. A claim of ineffective assistance of counsel presents a mixed question of law and fact. Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1). *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

### 1.   *Failure to object to instances of prosecutorial misconduct*

Petitioner first contends that his trial attorney erred by failing to object to the instances of prosecutorial misconduct raised in Grounds IV, V and VII. Applying the *Strickland* standard, the Michigan Court of Appeals disagreed that defense counsel's failure to object in those circumstances amounted to ineffective assistance of counsel. The Court further held that even if counsel had objected, there is no reasonable probability that the result of proceedings would have been different. (MCOA Op. 9.) I concluded above that Petitioner's claims of prosecutorial misconduct are without merit. Consequently, Petitioner cannot establish that he was prejudiced by counsel's alleged misconduct. "When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697. Because Petitioner cannot establish prejudice, his claim of ineffective assistance of counsel must fail.

2. *Failure to object to improper jury instruction*

Next, Petitioner contends that trial counsel improperly expressed agreement with the

jury instructions even though the trial court gave an improper instruction. Petitioner argues that the

trial court violated former M.C.R. 6.414(H) by stating the following at the start of jury instructions:

> Ladies and gentlemen, it's often the case that people have formed an impression from watching television that there is a transcript of everybody's testimony, so I try to remember to tell jurors before they begin deliberations that that is a myth. There is no transcript. Transcripts are created after a trial when someone orders them, and they take quite a bit of time to prepare. The only way you could hear the testimony again would be for me to ask the court reporter to read it to you from her notes. If it's absolutely necessary, I'll do that. But I would ask you, since that's quite time consuming, to rely on your collective memory before you ask me any such request.

(Tr. VI, 1156.) The substance of former M.C.R. 6.414(H) is now contained in M.C.R. 6.414(J),
which states:

> If, after beginning deliberation, the jury requests a review of certain testimony or evidence, the court must exercise its discretion to ensure fairness and to refuse unreasonable requests, but it may not refuse a reasonable request. The court may order the jury to deliberate further without the requested review, so long as the possibility of having the testimony or evidence reviewed at a later time is not foreclosed.

On direct appeal, the Michigan Court of Appeals found no violation of the court rule,

stating:

> We disagree that the trial court violated this rule. Indeed, in contrast to the situation in *People v Carter*, 462 Mich 206, 213 n 0; 612 NW2d 144 (2000), the trial court here did not foreclose the possibility of having testimony reviewed at a later time. The court stated that the court reporter's notes would be available for review if it was absolutely necessary. Defendant contends that this statement was insufficient to satisfy the court rule because "[a] request could surely be reasonable, even if not 'absolutely' necessary." We disagree with defendant's argument. The trial court properly informed the jury that it should rely on its collective memory but that the court's reporter's notes would be available if needed. Defense counsel did not act unreasonably in failing to object to this instruction.

Defendant has not demonstrated that he received ineffective assistance of counsel, and he has not demonstrated the need for an evidentiary hearing with respect to the issue.

(MCOA Op. 9-10.)

The decision of the Michigan Court of Appeals was a reasonable application of *Strickland*. While the trial court strongly encouraged the jury to rely on its collective memory, it did not foreclose the possibility of having the court reporter read testimony from her notes. Counsel's failure to make a frivolous or meritless objection does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 Fed. Appx. 309, 311 (6th Cir. 2004). Furthermore, Petitioner does not allege how he was prejudiced by the trial court's instruction. Consequently, he is not entitled to habeas corpus relief on his claim of ineffective assistance of counsel.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Date: July 1, 2010            /s/ Ellen S. Carmody
                                      ELLEN S. CARMODY
                                      United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).